## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| PHILADELPHIA INDEMNITY<br>INSURANCE COMPANY,<br><br>Plaintiff,<br>v.<br><br>ADKINS ENERGY, LLC; ROD GIESEKE;<br>JAY BUTSON; DAN HOLLAND;<br>MATTHEW FOLEY; ELMER RAHN;<br>DAVID SCHENK; DAVID DALY;<br>RAY BAKER; and PEARL CITY<br>ELEVATOR, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.<br><br>**JURY DEMANDED** |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES the Plaintiff, PHILADELPHIA INDEMNITY INSURANCE COMPANY,

by and through its counsel, and for its Complaint for Declaratory Judgment against Defendants,

ADKINS ENERGY, LLC; ROD GIESEKE; JAY BUTSON; DAN HOLLAND; MATTHEW

FOLEY; ELMER RAHN; DAVID SCHENK; DAVID DALY; RAY BAKER; and PEARL CITY

ELEVATOR, INC., states as follows:

## INTRODUCTION

1.      This is a declaratory judgment action wherein PHILADELPHIA INDEMNITY

INSURANCE COMPANY ("**Philadelphia**") seeks a declaration that it has no duty to defend, to

advance defense costs or to indemnify the Defendants herein in connection with the lawsuits

captioned *Pearl City Elevator, Inc., an Illinois cooperative v. Adkins Energy, LLC, a Delaware*

*limited liability company, Rod Gieseke, Jay Butson, Dan Holland, and Ray Baker*, filed on May

12, 2021 in the Court of Chancery of the State of Delaware, C.A. No. 2021-0412-JRS (the "**Second**

**Lawsuit**"), *Jay Butson, Rod Gieseke, and Dan Holland v. Matthew Foley, Elmer Rahn, David*

*Schenk, and David Daly, and Pearl City Elevator Inc., Defendants, and Adkins Energy, LLC and Ray Baker, Nominal Defendants* in the Court of Chancery for the State of Delaware, C.A. No. 2021-0438-JRS (the "**Third Lawsuit**"), and *Pearl City Elevator, Inc. v. Rod Gieseke,* No. 1:21-cv-04206, filed on August 6, 2021 in the United States District Court for the Northern District of Illinois (the "**Fourth Lawsuit**").

2.      Plaintiff Philadelphia is a Pennsylvania corporation with its principal place of business in Pennsylvania.

3.      Defendant ADKINS ENERGY, LLC ("**Adkins Energy**") is a limited liability company incorporated under the laws of Delaware with its principal place of business in Lena, Illinois. Upon information and belief, all of Adkins Energy's members are citizens of the state of Illinois or are entities which are incorporated under the laws of Illinois or Delaware and which have their principle place of business in Illinois.

4.      Upon information and belief, defendant ROD GIESEKE ("**Gieseke**") is a Missouri citizen who resides in the City of Lee's Summit in Jackson County, Missouri.

5.      Upon information and belief, defendant JAY BUTSON ("**Butson**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

6.      Upon information and belief, defendant DAN HOLLAND ("**Holland**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

7.      Upon information and belief, defendant MATTHEW FOLEY ("**Foley**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

8.      Upon information and belief, defendant ELMER RAHN ("**Rahn**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

9. Upon information and belief, defendant DAVID SCHENK ("**Schenk**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

10. Upon information and belief, defendant DAVID DALY ("**Daly**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

11. Upon information and belief, defendant RAY BAKER ("**Baker**") is an Illinois citizen who resides within the jurisdiction of the Northern District of Illinois.

12. Upon information and belief, Defendant PEARL CITY ELEVATOR, INC. ("**Pearl City**") is an Illinois corporation that was organized as a farming cooperative in 1918 and which has its principal place of business in the Village of Pearl City in Stephenson County, Illinois. As the named plaintiff in the Second Lawsuit, Pearl City is a necessary party to the relief sought herein and is named as a party solely in order to secure an adjudication binding upon it with regard to the matters alleged herein.

13. Pursuant to 28 USC § 1332(a), this Court has subject matter jurisdiction over this dispute because there is complete diversity between the plaintiff and the defendants herein, and the amount at issue exceeds $75,000, exclusive interest and costs.

14. Further, pursuant to 28 USC § 1391, venue is proper in this District because the defendants are doing business in this District, and this matter arises out of the insurance policies discussed below which were issued in this District.

## BACKGROUND STATEMENT OF FACTS

15. Philadelphia issued a claims-made Private Company Protection Plus Insurance Policy No. PHSD1494155, to Adkins Energy with a Policy Period November 11, 2019 to November 11, 2020 (the "**2019 Policy**"). A true and correct copy of the 2019 Policy with premium information redacted is attached hereto as Exhibit A.

16.     Philadelphia issued a claims-made Private Company Protection Plus Insurance Policy No. PHSD1587725, to Adkins Energy with a Policy Period of November 11, 2020 to November 11, 2021 (the "**2020 Policy**") (collectively with the 2019 Policy, the "**Policies**").  A true and correct copy of the 2020 Policy with premium information redacted is attached hereto as Exhibit B.

17.     Gieseke, Butson, Holland and Adkins Energy (as a nominal defendant) were named as defendants in connection with a lawsuit styled *Pearl City Elevator, Inc., an Illinois Cooperative, Plaintiff v. Rod Gieseke, Jay Butson, and Dan Holland, Defendants, and Adkins Energy, LLC, a Delaware Limited Liability Company, Nominal Defendant*, Case No. 2020-0419, filed on or about May 29, 2020 in the Court of Chancery of the State of Delaware (the "**First Lawsuit**").  A true and correct copy of the complaint filed in the First Lawsuit is attached as Exhibit C.

18.     On or about July 28, 2020, Philadelphia (through counsel) issued a letter to a representative of Gieseke, Butson, Holland and Adkins Energy setting forth its position that: (a) PIIC agreed to advance reasonable and necessary Defense Costs incurred by Gieseke, Butson, and Holland for their defense in the First Lawsuit, subject to a complete reservation of its rights under the 2019 Policy, common law and in equity; and (b) to the extent that nominal defendant Adkins Energy would require a defense in the First Lawsuit, coverage for Adkins Energy would be precluded per the 2019 Policy's Breach of Contract Exclusion Endorsement, PI-PRD-112 (01/15).

19.     The First Lawsuit proceeded to trial in October 2020, and after post-trial briefings and argument the court issued a memorandum ruling on March 23, 2021, with the final order and judgment entered on April 6, 2021.

20.     On May 20, 2021, a representative of Adkins Energy, Gieseke, Butson, Holland and Baker provided Philadelphia with notice of the Second Lawsuit.  A true and correct copy of the complaint filed in the Second Lawsuit is attached as Exhibit D.

21.     Also on May 20, 2021, a representative of Adkins Energy and Baker provided Philadelphia with notice of the Third Lawsuit.  A true and correct copy of the complaint filed in the Third Lawsuit is attached as Exhibit E.

22.     On or about August 23, 2021, a representative of Gieseke provided Philadelphia with notice of the Fourth Lawsuit.  A true and correct copy of the complaint filed in the Fourth Lawsuit is attached as Exhibit F.

### The First Lawsuit

23.     The First Lawsuit alleges that the Board of Governors of Adkins Energy (the "**Adkins Board**") has been comprised of six Governors, three of them designated by Pearl City (the "**Pearl City Governors**"), and three of them elected by the general membership, excluding Pearl City (the "**General Governors**"), who are the three persons named as individual defendants in the First Lawsuit.

24.     In the First Lawsuit, Pearl City asserted that because it has acquired more than 56% of the outstanding membership units of Adkins Energy (the "**Adkins Units**"), it had a right to appoint an additional seventh Governor to the Adkins Board, and that the Pearl City Board of Directors appointed Daly to serve as the seventh Governor.

25.     The First Lawsuit alleged that Gieseke, Butson, and Holland objected to the appointment of Daly to the Adkins Board on the ground that Pearl City improperly obtained the Adkins Units that increased its ownership interest in Adkins Energy to 56%.

26.     The First Lawsuit asserted that Gieseke, Butson, and Holland incorrectly asserted that Pearl City acquired Adkins Units through "Related Transactions" that were not properly approved by the Adkins Board, as required by the Operating Agreement for Adkins Energy.

27.     In the First Lawsuit Pearl City argued that Gieseke, Butson, and Holland were mistaken as to the scope of the term "Related Transaction" in the Adkins Energy Bylaws, and that the transfers by which Pearl City acquired 56% of the Adkins Units were not publicly traded through an established securities market that would affect the tax status of Adkins Energy.

28.     The First Lawsuit asserted that the method for trading of Adkins Units advocated by Gieseke, Butson, and Holland is a "byzantine system" for trading that was calculated to enable Gieseke, Butson, and Holland to remain General Governors, as they have for the past twelve years.

29.     The First Lawsuit asserted a Count I for Declaratory Judgment, seeking a declaration that by virtue of Pearl City's purchase of 7,088 Adkins Units, Pearl City currently owns more than fifty-six percent (56%) of the outstanding Adkins Units, and thus the Board of Governors has increased to seven Governors and Pearl City is entitled to designate the 7th Governor – Daly – thereby increasing the number of Pearl City Governors to four, pursuant to Section 5.2 of the Operating Agreement.

30.     The First Lawsuit asserted a Count II for Breach of the Adkins Operating Agreement by the General Governors, alleging that the General Governors breached the Operating Agreement by: (a) refusing to expand the Board to seven Governors and to permit the appointment of a Pearl City Governor as the 7th Governor in violation of Sections 5.2 and 5.16 of the Operating Agreement; (b) meeting in secret on April 21, 2020 before the Adkins Board meeting in violation of Sections 5.10 and 5.16 of the Operating Agreement; and (c) not permitting the Pearl City

Governors to vote on the Transfer Motion in violation of Sections 5.10 and 5.16 of the Operating Agreement.

31.     The First Lawsuit also asserted a Count III for Breach of the Covenant of Good Faith and Fair Dealing by the General Governors, alleging that the General Governors have acted unreasonably and have denied Pearl City the benefits of the bargain Pearl City reasonably expected by, *inter alia*, (a) refusing to expand the Board to seven Governors and to permit the appointment of a Pearl City Governor as the 7th Governor; (b) meeting in secret on April 21, 2020 before the Adkins Board meeting; and (c) blocking the Pearl City Governors from voting on the Transfer Motion.

32.     The First Lawsuit sought a declaratory judgment that: (a) the purchase of 7,088 Adkins Units by Pearl City pursuant to private sales with its cooperative members and also through the FNC Ag Stock exchange is permitted under the Operating Agreement, and as a result of such purchases, Pearl City currently owns more than 56% of the outstanding Adkins Units, so the size of the Board of Governors is increased to seven Governors and David Daly is appointed as the 7th Governor as of June 1, 2020, the beginning of a new quarter; and (b) Pearl City is entitled to the costs and disbursements of the First Lawsuit, including reasonable attorneys' fees from the Defendant General Governors.

33.     The First Lawsuit also sought a finding that each Defendant General Governor breached the Operating Agreement; permanent injunctions enjoining the Defendant General Governors' unlawful conduct and to redress the irreparable harm that Pearl City has suffered; temporary, preliminary and permanent injunctions against Defendants from using Adkin Energy's funds to pay for the legal fees incurred in this action; a requirement that the Defendant General Governors pay Pearl City for the cost of this action, including without limitation reasonable

attorneys' fees and costs; and an award of any other just and reasonable relief to make Plaintiff whole under the circumstances.

34.     The First Lawsuit went to trial in October 2020, and upon conclusion the court took the matter under advisement.

35.     After post-trial briefing, the court in the First Lawsuit issued a judgment in favor of Pearl City on April 6, 2021, though it refused to award fees against the defendants in the First Lawsuit.

36.     Gieseke, Butson, and Holland are currently appealing the judgment entered in the First Lawsuit.

**The Second Lawsuit**

37.     The Second Lawsuit alleges that "it is an action to enjoin the purported termination of the Grain Delivery Agreement between Plaintiff Pearl City" and Adkins Energy.

38.     The Second Lawsuit alleges the Grain Delivery Agreement (the "**GDA**") is a contract between Pearl City and Adkins Energy and was executed on or around September 1, 2011.

39.     The Second Lawsuit alleges that upon execution of the GDA, Pearl City became the exclusive supplier of corn to Adkins Energy.

40.     The Second Lawsuit alleges that the General Governors, with the assistance of Baker, caused Adkins Energy to terminate the GDA "in violation of its plain terms."

41.     The Second Lawsuit alleges that Adkins Energy is taking these measures "as retribution against Pearl City for purchasing additional units of Adkins' Board of Governors – which was the subject of separate litigation in this court and which Pearl City won" on March 23, 2021."

42. The Second Lawsuit further alleges, "immediately after the Pearl City Governors issued their first written consents to ensure that their rights as the new Board majority would be respected and that all Governors would be involved in decision making, the General Governors terminated the GDA."

43. The Second Lawsuit alleges that the General Governors and Baker, are "simply employing a scorched earth strategy to retaliate for Pearl City's victory in the related Delaware litigation and exercising its majority control of the Board, and if the General Governors and Baker do not get their way, then they will burn the whole house down."

44. The Second Lawsuit alleges that on February 19, 2021, after a post-trial briefing and argument was completed in the First Lawsuit, the General Governors filed a five day notice stating that the General Governors intended to provide a Notice of Default under the GDA to Pearl City.

45. The Second Lawsuit alleges that on February 24, 2021, Pearl City moved to stay the threatened termination of the GDA until after the court issue its post-trial opinion in the 18-110 action.

46. The Second Lawsuit alleges that on February 26, 2021, the General Governors delivered a Notice of Default to Pearl City, and that pursuant to the GDA, Pearl City had 30 days to cure any purported default.

47. The Second Lawsuit alleges that on March 26, 2021 Pearl City responded to the Notice of Default, and that response demonstrates that "the true motivation for threatening to terminate the GDA now is retribution on the General Governors for Pearl City having the audacity to purchase sufficient Units to appoint a seventh and tie-breaking governor to the Board of Governors."

48. The Second Lawsuit alleges on May 6, 2021, the General Governors "purported to terminate the GDA . . . immediately after the Pearl City Governors issued their first written consent as a majority of the Board" and that at that time, "the General Governors stated their intention to purchase corn from suppliers other than Pearl City – while also continuing to purchase corn from Pearl City at less than the price calculation set for in the GDA."

49. The Second Lawsuit alleges that the General Governors "essentially" are seeking to "rewrite the GDA unilaterally . . . ."

50. The Second Lawsuit contains a cause of action against Adkins Energy for breach of the GDA, and a cause of action against Gieseke, Butson, Holland and Baker alleging that by causing Adkins Energy to terminate the GDA, those individuals breached the operating agreement.

51. In the Second Lawsuit's Prayer for Relief, Pearl City requests the Court to enter an order as follows:

A. Issuing a declaratory judgment that Pearl City is not in default of the GDA;

B. Enjoining Adkins Energy from terminating the GDA;

C. Ordering Adkins Energy to specifically perform the GDA;

D. Alternatively, awarding damages to Pearl City in an amount to be determined by the Court, including, without limitation, awards of pre- and post-judgment interest in the amounts proved at trial;

E. Enjoining Adkins Energy and/or from entering into a new supply or purchase agreement for corn without full Board authority;

F. Declaring that the purchase of corn from other sources without full Board approval constitutes a breach of the GDA by Adkins Energy as well as a breach of the Operating Agreement by the General Governors and Baker;

G. Requiring Defendants to pay Plaintiff for the cost of this action, including without limitation reasonable attorneys' fees and costs; and

H.    Awarding any other just and reasonable relief to make Pearl City whole under the circumstances.

**The Third Lawsuit**

52.    The Third Lawsuit alleges that in August 2019, Adkins Energy delivered a draft notice of default to Pearl City identifying Pearl City's areas of performance that were falling short of what was required under the GDA between the parties, and in late 2019 and early 2020.

53.    The Third Lawsuit further alleges that while Pearl City's performance had not improved, Adkins Energy had to withhold further discussion of the GDA in 2020 because of the COVID pandemic and the First Lawsuit.

54.    The Third Lawsuit alleges that after trial and post-trial argument in the First Lawsuit, and following "extended diligence" with Adkins Energy' corporate counsel, Locke Lord, as well as the General Governors' own counsel, the General Governors, acting as Disinterested Governors, decided it was in Adkins Energy's best interest to issue a formal notice of default of the GDA to Pearl City.

55.    The Third Lawsuit alleges that on February 19, 2021, the notice of default was delivered to Pearl City and that "In keeping with its practice since 2019, Pearl City did not work toward correcting the defaults identified. Instead, Pearl City chose to litigate Adkins' right to issue a notice of default."

56.    The Third Lawsuit alleges that on March 26, 2021, "just prior to the expiration of Pearl City's contractually guaranteed thirty-day cure period following the notice of default", Pearl City sent a letter to Adkins Energy denying all of the identified breaches of the GDA; that Pearl City invited Adkins Energy to a meeting to discuss the parties' positions; and that Adkins Energy accepted Pearl City's request for a meeting.

57.     The Third Lawsuit alleges that on April 23, 2021, disinterested representatives from Adkins Energy (Gieseke, Baker, Jason Townsend and Eric Lockart) met with Pearl City to discuss the GDA, and Adkins Energy and Pearl City's competing letters addressing performance under the GDA, and that during the April 23, 2021 meeting, Pearl City simply reiterated the points raised in its March 26, 2021 responsive letter and did not offer any new or different information.

58.     The Third Lawsuit alleges that on May 3, 2021, Pearl City delivered a letter to Adkins Energy addressing only the breach arising from the independent auditor's identification of Pearl City's repeated failure to provide relevant information such that the auditor could complete its compliance audit.

59.     The Third Lawsuit alleges that only two hours after a May 3, 2021 request to select a new auditor, the Pearl City Governors delivered to Adkins Energy the first purported written consent of the Adkins Board of Governors through which Pearl City unilaterally imposed upon Adkins Energy and Baker several onerous requirements aimed at shifting day-to-day operating responsibilities away from Baker to, effectively, Pearl City as possessing a majority of the Board of Governor seats.

60.     The Third Lawsuit alleges that the Pearl City Governors did not provide the General Governors with notice of their desired business decisions nor did they seek discussion or input from the General Governors.

61.     The Third Lawsuit alleges that the defendants therein retaliated against Adkins Energy for terminating the GDA on May 6, 2021 by unilaterally terminating Adkins Energy's longtime corporate counsel law firm of Locke Lord on May 7, 2021.

62.     The Third Lawsuit alleges that the Pearl City Governors' unilaterally terminated Baker and required him to leave his computer at the Adkins Energy facility which allowed them

12

to have access to the Disinterested Governors' privileged communications on Baker's computer and recklessly exposed those communications to purposeful and bad faith disclosure or inadvertent/reckless disclosure.

63.     The Third Lawsuit alleges that, without notice or discussion with the General Governors, Pearl City, the Pearl City Governors and numerous other Pearl City representatives entered the Adkins Energy Facility on May 10, 2021 with an armed Stephenson County Sheriff's officer; informed Baker that he was being relieved of his General Manager's position because the Adkins Board had lost confidence in his performance; told Baker to leave his Adkins Energy computer on site and to have no contact with Adkins Energy's customers, vendors, employees or banks; told Baker that he could no longer conduct business on Adkins Energy's behalf; and then escorted Baker off the Adkins Energy property with the armed Stephenson County Sheriff's officer close in tow.

64.     In addition, the Third Lawsuit alleges that the defendants therein engaged the services of a private security service for the Adkins Facility when no such security force was needed in the past and that they "undertook these efforts to vilify Baker."

65.     The Third Lawsuit claims that the "unlawful and extreme conduct threatens Adkins' relationship with Baker who has been and is a key employee" and that the treatment of Baker exposes Adkins Energy to claims of retaliation, breach of contract and harassment from Baker.

66.     The Third Lawsuit further alleges that on May 10, 2021, the Pearl City Governors executed a second written consent related to Baker which directed removing Baker as an authorized signer on all of Adkins' bank accounts and that "Defendants' serial litigation and the management upheaval threatens Adkins' access to credit" and that "Adkins' banking partners have

signaled that they are not interested in loaning money to the Company to undertake capital improvements given the fact that Pearl City continues to litigate with the Board of Governors."

67.     The Third Lawsuit alleges that the "clandestine coup leading up to and including the seizure of the Adkins' Facility on Monday, May 10, 2021 was a wrongful taking by the Pearl City Governors."

68.     In Count One (Breach of Contract), the Third Lawsuit alleges that Pearl City and the Pearl City Governors have breached the Operating Agreement, seeks a declaration that the General Governors are entitled to a declaration that the Defendant's unlawful conduct is void and claims that defendants' breaches threaten Adkins Energy, the General Governors and the General Members with irreparable harm, and the General Governors and Adkins lack an adequate remedy at law.

69.     In Count Two (Breach of Fiduciary Duty), the Third Lawsuit alleges that Pearl City owes the General Members and Adkins Energy fiduciary duties as the controlling majority owner, and that Pearl City breached its fiduciary duty, and seeks a declaration that the General Governors are entitled to a declaration that "the Defendant's unlawful conduct is void."

70.     In the Third Lawsuit's Prayer for Relief, Butson, Gieseke, and Holland request that the Court enter judgment as follows:

A.     Entering a status quo ante order to place the parties back to the position they found themselves prior to the Baker's removal on May 10, 2021 and prior to the unlawful May 3, 2021 written consent;

B.     Consistent with 10 Del. C. § 6501 and 6 Del. C. § 18-111, declaring and adjudicating that the Pearl City Governors' written consents are void;

C.     Enjoining Defendants from acting by written consent without reasonable prior notice to the General Governors as to the business contemplated;

D.     Enjoining Defendants from undertaking any actions that would violate the status quo order entered;

E.  Ordering the immediate return of Baker's computer and that an independent forensic analysis of Bakers' computer be undertaken (at Defendants' cost) to determine what data was accessed (and by whom) following Defendants' seizure of the computer on May 10, 2021;

F.  Potentially disqualifying Defendants' counsel in the GDA Litigation given unilateral and brazen efforts to gain access to Adkins Energy and the General Governors' privileged information;

G.  Alternatively, awarding the General Governors and/or Adkins Energy damages in an amount to be determined by the Court following trial, including, without limitation pre- and post-judgment interest;

H.  Awarding the General Governors and Adkins Energy the costs of this litigation, including without limitation reasonable attorneys' fees, costs and expenses; and

I.  Such other or additional relief that the Court deems just and proper.

**The Fourth Lawsuit**

71.  The Fourth Lawsuit alleges that Pearl City has suffered "substantial reputational harm . . . as a result of Gieseke's crusade of publicizing false, misleading, and unsubstantiated statements with a goal of substantially harming Pearl City's business."

72.  The Fourth Lawsuit alleges that on or about July 20, 2021, Gieseke published false, misleading and defamatory statements about Pearl City by sending through the United States Postal Service an "Important Meeting Notice" to Adkins' General Members, a group consisting of approximately 270 farmers in Northern Illinois.

73.  It alleges that Giesekes' statements about Pearl City in that publication were false, misleading, defamatory and disparaging, and Gieseke knew or should have known the substantial harm Pearl City would suffer upon dissemination of the offending publication.

74.  The Fourth Lawsuit contains causes of action for Defamation *Per Se* and False Light Invasion of Privacy.

**The Policies**

75.     The 2019 Policy was in effect from November 11, 2019 to November 11, 2020.

76.     The 2020 Policy incepted on November 11, 2020 and expires on November 11, 2021.

77.     The Policies were issued to "Adkins Energy LLC" which is the entity identified as the "Named Insured" on the Policies' Declarations.

78.     Of the Coverage Parts provided in the Private Company Protection Plus form, Adkins Energy purchased coverage under Part 1, the Directors and Officers and Liability Insurance (the "**D&O Insurance**"), Part 2, the Employment Practices Liability Insurance (the "**EPL Insurance**"), and Part 3, the Fiduciary Liability Insurance.

79.     As set forth in the Declarations, and except as modified by endorsement, the 2019 Policy's Limit of Liability under the D&O Insurance is $5,000,000 for the Policy Period, which is the maximum aggregate liability under Part 1 for all Damages on account of all Claims made during the 2019 Policy's Policy Period, whether covered under Insuring Agreement A, B or C.

80.     As set forth in the Declarations, and except as modified by endorsement, the 2020 Policy's Limit of Liability under the D&O Insurance is $5,000,000 for the Policy Period, which is the maximum aggregate liability under Part 1 for all Loss on account of all Claims made during the 2020 Policy's Policy Period whether covered under Insuring Agreement A, B or C.

81.     Coverage under the Part 1, Insuring Agreements I.B. and I.C. is also subject to a $10,000 Retention for each Claim.

82.     In addition, pursuant to a Shared Limits Endorsement, PI-PRD-38 (09/02) contained in the Policies, the combined / shared Limit of Liability for any Claim under Part 1 and any claim under Part(s) 2, 3 shall be $5,000,000.

**COUNT I - DECLARATORY JUDGMENT UNDER 28 USC § 1331**

**(Against Adkins Energy, Gieseke, Butson, Holland, and Baker)**

**THERE IS NO COVERAGE UNDER THE POLICIES FOR THE SECOND LAWSUIT**

83.     Philadelphia repeats and realleges Paragraphs 1 to 82 as paragraph 83 as if set forth fully herein.

84.     The Policies are both written on a "claims made and reported" basis.

85.     The Declarations of the Policies provide in pertinent part:

EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.

86.     In addition, under Part 1, the D&O Insurance, Section I., INSURING AGREEMENTS, the Policies provide the following:

A.     The Underwriter shall pay on behalf of the Individual Insured, Loss from Claims made against Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, except to the extent the Private Company has indemnified the Individual Insureds for such Loss.

B.     The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against Individual Insureds during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for D&O Wrongful Acts, if the Private Company has indemnified such Individual Insureds for such Loss.

C.     The Underwriter shall pay on behalf of the Private Company, Loss from Claims made against the Private Company during the Policy Period (or, if applicable, during the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for a D&O Wrongful Act

87. Under Part 4, COMMON POLICY DEFINITIONS, Item B., the Policies define

"Claim," in pertinent part, to mean:

    1.      a written demand for monetary or non-monetary relief;

    2.      a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

*     *     *

against an Insured for a Wrongful Act, including any appeal therefrom . . .

*     *     *

A claim shall be considered made when an Insured first receives notice of the Claim.

88. Under Part 6, COMMON POLICY CONDITIONS, Section IV., NOTICE / CLAIM REPORTING CONDITIONS, Item C., the Policies state:

> All Loss arising out of the same Wrongful Act and all Interrelated Wrongful Acts shall be deemed one Loss on account of a one Claim. Such Claim shall be deemed to be first made when the earliest of such Claims was first made or first deemed made pursuant to Clause B. hereinabove.

89. Under Part 4, COMMON POLICY DEFINITIONS, Item I., "Interrelated Wrongful Act means: any causally connected Wrongful Act or any series of the same, similar or related Wrongful Acts."

90. Under Part 4, COMMON POLICY DEFINITIONS, Item T., "Wrongful Act" is defined in relevant part as "with respect to Part 1, any D&O Wrongful Act."

91. The term "D&O Wrongful Act" in the 2019 Policy is defined under Part 1, Section II., DEFINITIONS, Item A. of the Policy, as amended by the 2019 Policy's Pro-Pak Endorsement, as follows:

    A.      D&O Wrongful Act means any actual or alleged:

18

1.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured; or

2.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the Private Company; or

3.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured arising out of serving in his/her capacity as a director, officer, governor or trustee of an Outside Entity if such service is at the written request or direction of the Private Company.

92.    The term "D&O Wrongful Act" is defined in the 2020 Policy under Part 1, Section II., DEFINITIONS, Item A. of the Policy, as amended by the 2020 Policy's PRIVATE COMPANY ENHANCEMENT ENDORSEMENT, PI-PRD 126 (04/19), as follows:

A.    D&O Wrongful Act means any actual or alleged:

1.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured; or

2.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the Private Company; or

3.    act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an Individual Insured in his/her capacity as an Individual Insured or any other matter claimed against any Individual Insured solely by reason of his or her status as an Individual Insured ; or

a.    if such service is at the request or direction of the Private Company; and

b.    if, at the time such service began, the Individual Insured did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a Claim under this Policy.

93.    Each of the First Lawsuit, Second Lawsuit, Third Lawsuit and Fourth Lawsuit is Claim in that they are each "a written demand for monetary or non-monetary relief" and "a judicial

or civil proceeding commenced by the service of a complaint or similar pleading" which are made "against an Insured for a Wrongful Act[.]"

94.     However, the Second Lawsuit, Third Lawsuit and Fourth Lawsuit (collectively, the "**Subsequent Lawsuits**") do not assert the same Wrongful Act as the First Lawsuit; nor do the First Lawsuit and any of the Subsequent Lawsuits assert "Interrelated Wrongful Acts" as defined by the Policies.

95.     None of the Subsequent Lawsuits constitute Claims deemed to be first made under the 2019 Policy.

96.     The 2020 Policy as amended by the PARENT EXCLUSION endorsement, PI-PRD-68 (09/02) provides as follows:

This Policy is amended as follows:

With respect to coverage under Part(s) 1, 2, 3, the Underwriter shall not be liable to make any payment for Loss in connection with all or part of any Claim that is, directly or indirectly, brought or maintained by or on behalf of

Pearl City Elevator, Inc.

or its subsidiaries or any director, officer, governor, trustee, employee, volunteer, management committee member, or member of the Board of Managers of such entity(ies).

All other terms and conditions of this Policy remain unchanged[.]

97.     Pearl City is the plaintiff in the Second Lawsuit.

98.     Therefore, the Second Lawsuit is a Claim that is, directly or indirectly, brought or maintained by or on behalf of Pearl City or its subsidiaries or any director, officer, governor, trustee, employee, volunteer, management committee member, or member of the Board of Managers.

99.     Consequently, coverage for the Second Lawsuit is precluded under the 2020 Policy's PARENT EXCLUSION.

100.    In addition, the 2019 Policy's PART 6, (COMMON POLICY CONDITIONS), Section XV (CHANGE IN OWNERSHIP OR CONTROL), as amended by the Business Advantage Pro-Pak Elite Coverage Endorsement, PI-PRPD-72 (05/06), provides:

> If after the inception of the Policy Period a Transaction occurs then this Policy shall remain in force, but only for Claims made during the Policy Period for Wrongful Acts committed prior to the effective date of the Transaction and the premium shall immediately be considered fully earned.
>
> However, in the case of a Public Offering, the Insured shall provide written notice of the Public Offering to the Underwriter no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The Underwriter shall provide a quotation for the Public Offering.
>
> The Insured shall have the right, within 45 days after the Transaction (or such date the Underwriter may agree by endorsement), to request an offer from the Underwriter for a Run-Off Policy for a term up to 6 years. If elected, such Run-Off Policy shall be conditioned upon payment during the Policy Period of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the Underwriter.

101.    The term "Transaction" is defined in the 2019 Policy's Part 4, Common Policy Definitions R. as:

1.    the Private Company merging into or consolidating with another entity such that the other entity is the surviving entity; or

2.    another entity, or person or group of entities and/or persons acting in concert acquiring securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the Private Company; or

3.    Public Offering.

102.    The First Lawsuit asserts a claim by Pearl City that it acquired more than 56% of the outstanding membership units of Adkins such that it has the right to designate a seventh Governor on Adkins' Board.

103.     The Memorandum Opinion issued by the Delaware Chancery Court in the First Lawsuit on March 23, 2021, states in part:

> Because the Court has found an Opinion was required to effectuate the transfers, the relevant date relating to the parties' notice dispute is September 1, 2020, the date the PC Opinions were delivered. Pearl City mailed written notice on May 29, 2020, and the Transfer Notices and Bills of Sale were received on or around June 2, 2020. Thus, Pearl City's written notice of its transfers would have been effective by the date Pearl City was eligible to have the unit transfers recognized by the [Adkins].

104.     The Second Lawsuit asserts a breach of the GDA on May 6, 2021.

105.     The Second Lawsuit does not assert Wrongful Acts committed prior to the effective date of the Transaction, September 1, 2020, and therefore is not covered under the 2019 Policy.

106.     Accordingly, Philadelphia has no duty under the Policies to defend, to advance defense costs or to indemnify any of the Defendants herein in connection with the Second Lawsuit.

107.     Defendants, however, deny that Philadelphia has no duty under the Policies to defend, to advance defense costs or to indemnify any of the Defendants herein in connection with the Second Lawsuit.

108.     An actual controversy exists between the parties and this Court is vested with the power to declare the rights and liabilities of the parties hereto and to give such other and further relief as it deems necessary under the facts and circumstances.

WHEREFORE, Philadelphia Indemnity Insurance Company respectfully requests this Honorable Court to issue an order:

(a)     declaring that Philadelphia has no duty under the Policies to defend, to advance Defense Costs or to indemnify Defendants in connection with the Second Lawsuit; and

22

(b)    awarding Philadelphia such other and further relief as the Court may deem just and proper.

## COUNT II – DECLARATORY JUDGMENT UNDER 28 USC § 1331

## (Against Foley, Rahn, Schenk, Daly, Adkins Energy, and Baker )

## THERE IS NO COVERAGE UNDER THE POLICIES FOR THE THIRD LAWSUIT

109.    Philadelphia repeats and realleges Paragraphs 1 to 108 as paragraph 109 as if set forth fully herein.

110.    Under Part 5, COMMON POLICY EXCLUSIONS, Item K., as amended by the Pro-Pak Endorsement, the 2019 Policy provides:

> The Underwriter shall not be liable to make any payment for Loss in connection with any Claim made against the Insured:

> *       *       *

> K.    brought or maintained by or maintained by any Individual Insured except:

>> 1.    any claim in the form of a cross claim, third party claim or other claim for contribution or indemnity by an Individual Insured which is part of or results directly from a Claim which is not otherwise excluded by this Policy:

>> 2.    a Claim for an Employment Practice Act or a Fiduciary Liability Act;

>> 3.    a Claim for a D&O Wrongful Act brought or maintained by an Employee(s) who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the Private Company if such Claim for a D&O Wrongful Act is brought and maintained by such employee without the assistance, participation or solicitation of such persons.

> PART 5, (COMMON POLICY EXCLUSIONS), Item K. will not apply to any Claim:

>> 1.    in which the party bringing the Claim has not served as a director, trustee, manager, officer or equivalent executive of the Private

23

Company within four (4) years immediately preceding the date the Claim is first made;

2. in which the party bringing the Claim has not brought the Claim in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other Insured not described in line 1 above; or

3. based upon, arising from, or attributable to any Public Offering.

111. Under Part 5, COMMON POLICY EXCLUSIONS, Item K., as amended by the PRIVATE COMPANY ENHANCEMENT ENDORSEMENT, PI-PRD 126 (04/19), the 2020 Policy provides:

The Underwriter shall not be liable to make any payment for Loss in connection with any Claim made against the Insured:

*      *      *

K. brought or maintained by or maintained by any Individual Insured except:

1. any claim in the form of a cross claim, third party claim or other claim for contribution or indemnity by an Individual Insured which is part of or results directly from a Claim which is not otherwise excluded by this Policy:

2. a Claim for an Employment Practice Act or a Fiduciary Liability Act;

3. a Claim for a D&O Wrongful Act brought or maintained by an Employee(s) who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the Private Company if such Claim for a D&O Wrongful Act is brought and maintained by such employee without the assistance, participation or solicitation of such persons.

Exclusion K. will not apply to any Claim:

1. in which the party bringing the Claim has not served as a director, trustee, manager, Officer or equivalent executive of the Private Company within one (1) year immediately preceding the date the Claim is first made;

24

2.  in which the party bringing the Claim has not brought the Claim in concert or cooperation with, at the suggestion of, or with the participation, active assistance, or intervention of any other Insured not described in line 1 above; or

3.  based upon, arising from, or attributable to any Public Offering;

4.  brought by a whistleblower pursuant to any federal, state, local or foreign law against an Individual Insured.

112.    "Individual Insured" is defined in the 2019 Policy under Part 4, COMMON POLICY DEFINITIONS, Item G., in relevant part, to include "any individual who has been, now is or shall become a director, officer, governor, trustee, Employee, volunteer, Management committee member, or member of the Board of Managers of the Private Company[.]"

113.    "Individual Insured" is defined in the 2020 Policy under Part 4, COMMON POLICY DEFINITIONS, Item G., in relevant part to include "any individual who has been, now is or will become a director, officer, governor, trustee, Employee, volunteer, management committee member, risk manager, in-house counselor member of the Board of Managers of the Private Company[.]"

114.    Butson, Gieseke, and Holland are the Plaintiffs in the Third Lawsuit.

115.    The Third Lawsuit alleges that, in relevant part, Butson is a General Governor.

116.    The Third Lawsuit alleges that, in relevant part, Gieseke is a General Governor, a Chairman of the Board of Governors, and a member of the Executive Committee.

117.    The Third Lawsuit alleges that, in relevant part, Holland is a General Governor, Treasurer of the Board of Governors, and a member of the Executive Committee.

118.    Consequently, coverage for the Third Lawsuit is precluded by the foregoing exclusion as it is a Claim being brought or maintained by any Individual Insured, or a party who has served, within one year prior to the date a Claim was first made, as a director, trustee, manager,

25

officer or equivalent executive of Adkins Energy, or in concert or cooperation with such a director, trustee, manager, officer or equivalent executive of Adkins Energy

119. There is no coverage for the Third Lawsuit as it is precluded by the foregoing exclusion under Part 5, Section K. of the Policies.

120. Defendants, however, deny that Philadelphia has no duty under the Policies to defend, to advance defense costs or to indemnify any of the Defendants herein in connection with the Third Lawsuit.

121. An actual controversy exists between the parties and this Court is vested with the power to declare the rights and liabilities of the parties hereto and to give such other and further relief as it deems necessary under the facts and circumstances.

WHEREFORE, Philadelphia Indemnity Insurance Company respectfully requests this Honorable Court to issue an order:

(a)     declaring that Philadelphia has no duty to defend, to advance defense costs or to indemnify any of the defendants in the Third Lawsuit under the Policies; and

(b)     awarding Philadelphia Indemnity Insurance Company such other and further relief as the Court may deem just and proper.

## COUNT III – DECLARATORY JUDGMENT UNDER 28 USC § 1331

### (Against Gieseke)

**THERE IS NO COVERAGE UNDER THE POLICIES FOR THE FOURTH LAWSUIT**

122. Philadelphia repeats and realleges Paragraphs 1 to 121 as paragraph 122 as if set forth fully herein.

123. As set forth above, the Fourth Lawsuit is a Claim in that it is "a written demand for monetary or non-monetary relief" and "a judicial or civil proceeding commenced by the service of a complaint or similar pleading" which are made "against an Insured for a Wrongful Act[.]"

124. However, the Fourth Lawsuit does not assert the same Wrongful Act as the First Lawsuit; nor do the First Lawsuit and the Fourth Lawsuit assert "Interrelated Wrongful Acts" as defined by the Policies.

125. The Fourth Lawsuit does not constitute a Claim deemed to be first made under the 2019 Policy.

126. In addition, the Fourth Lawsuit is a Claim that is, directly or indirectly, brought or maintained by or on behalf of Pearl City or its subsidiaries or any director, officer, governor, trustee, employee, volunteer, management committee member, or member of the Board of Managers.

127. Consequently, coverage for the Second Lawsuit is precluded under the 2020 Policy's PARENT EXCLUSION.

128. In addition, the Fourth Lawsuit alleges defamatory statements made by Gieseke on July 20, 2021.

129. The Fourth Lawsuit does not assert Wrongful Acts committed prior to the effective date of the Transaction, and therefore is not covered under the 2019 Policy.

130. Accordingly, Philadelphia has no duty under the Policies to defend, to advance defense costs or to indemnify any of the Defendants herein in connection with the Fourth Lawsuit.

131. Defendants, however, deny that Philadelphia has no duty under the Policies to defend, to advance defense costs or to indemnify any of the Defendants herein in connection with the Fourth Lawsuit.

132.    An actual controversy exists between the parties and this Court is vested with the power to declare the rights and liabilities of the parties hereto and to give such other and further relief as it deems necessary under the facts and circumstances.

WHEREFORE, Philadelphia Indemnity Insurance Company respectfully requests this Honorable Court to issue an order:

(a)    declaring that Philadelphia has no duty to defend, to advance defense costs or to indemnify any of the defendants in the Fourth Lawsuit under the Policies; and

(b)    awarding Philadelphia Indemnity Insurance Company such other and further relief as the Court may deem just and proper.

**COUNT IV – DECLARATORY JUDGMENT UNDER 28 USC § 1331**

**(Against Adkins Energy)**

**THERE IS NO COVERAGE UNDER THE POLICIES FOR
THE SECOND LAWSUIT OR THIRD LAWSUIT**

133.    Philadelphia repeats and realleges Paragraphs 1 to 132 as paragraph 133 as if set forth fully herein.

134.    Under Part 1, Section III., EXCLUSIONS, Paragraph C., as amended by the Breach of Contract Exclusion Endorsement, PI-PRD-112 (01/15), the Policy states that PIIC shall not be liable to make payment for Loss in connection with any Claim made against the Private Company under Insuring Agreement C:

C.    arising out of, based upon or attributable to any actual or alleged liability under any written or oral agreement; however this exclusion does not apply to liability which would have attached even in the absence of such contract or agreement.

135.    The Second Lawsuit arises out of, is based upon or attributable to any actual or alleged liability under the GDA.

136.    The Third Lawsuit arises out of, is based upon or attributable to any actual or alleged liability under the Adkins Energy Operating Agreement and/or the GDA.

137.    As a result there is no coverage under the Policies for Adkins Energy in connection with the Second Lawsuit or Third Lawsuit in their entirety pursuant to the foregoing exclusion under Part 1, Section II., Paragraph C. of the Policies.

138.    Adkins Energy, however, denies that Philadelphia has no duty under the Policies to defend, to advance defense costs or to indemnify it in connection with the Second Lawsuit or Third Lawsuit.

139.    An actual controversy exists between the parties and this Court is vested with the power to declare the rights and liabilities of the parties hereto and to give such other and further relief as it deems necessary under the facts and circumstances.

WHEREFORE, Philadelphia Indemnity Insurance Company respectfully requests this Honorable Court to issue an order:

(a)    declaring that Philadelphia has no duty to defend, to advance defense costs or to indemnify Adkins Energy under the Policies; and

(b)    awarding Philadelphia such other and further relief as the Court may deem just and proper.

**COUNT V – DECLARATORY JUDGMENT UNDER 28 USC § 1331**

**(Against All Defendants)**

**OTHER TERMS, CONDITIONS AND EXCLUSIONS LIMIT COVERAGE UNDER THE POLICIES IN PART OR IN WHOLE**

140.    Philadelphia repeats and realleges repeats and realleges Paragraphs 1 to 139 as paragraph 140 as if set forth fully herein.

141.    This Count is pled in the alternative.

142.    Other terms, conditions and exclusions contained in the Policies may limit or preclude coverage for the Second Lawsuit and/or Third Lawsuit in part or in whole. These include:

    a.    The Policies' definition of "Loss" contained in Part 4, COMMON POLICY DEFINITIONS, Item J.

    b.    The Policies' definition of "Damages" contained in Part 4, COMMON POLICY DEFINITIONS, Item C.

    c.    The Policies' definition of "Individual Insured" contained in Part 4, COMMON POLICY DEFINITIONS, Item G., as amended.

    d.    The Policies' definition of "D&O Wrongful Act" contained in Part 1, Section II., Item A., as amended.

    e.    The Policies' definition of "Defense Costs" contained in Part 4, COMMON POLICY DEFINITIONS, Item D.

    f.    The Policies' Part 5, COMMON POLICY EXCLUSIONS, Section M.

    g.    The Policies' Part 6, COMMON POLICY CONDITIONS, Section XIX., ALLOCATION.

143.    However, the Defendants deny that coverage does not exist in full for the Second Lawsuit or Third Lawsuit under one or all of the Policies.

144.    An actual controversy exists between the parties and this Court is vested with the power to declare the rights and liabilities of the parties hereto and to give such other and further relief as it deems necessary under the facts and circumstances.

WHEREFORE, Philadelphia Indemnity Insurance Company respectfully requests this Honorable Court to issue an order:

    (a)    declaring that Philadelphia has no duty under the Policies to defend, to advance Defense Costs or to indemnify Defendants in connection with the Second Lawsuit, Third Lawsuit or Fourth Lawsuit; and

(b)     awarding Philadelphia Indemnity Insurance Company such other and further relief

as the Court may deem just and proper.


PHILADELPHIA INDEMNITY INSURANCE
COMPANY


BY:  ____/s David Grassmick
David Grassmick


David Grassmick (ARDC #6277563)
John C. De Koker III (ARDC # 6292675)
COPE EHLERS, P.C.
135 S. LaSalle Street
Suite 3050
Chicago, IL 60603
Tel: (312) 549-9384
Fax: (312) 549-9389
dgrassmick@copeehlers.com
jdekoker@copeehlers.com